235 So.2d 631 (1970)
Eugene FONTENOT and Cecilia Fontenot
v.
MARQUETTE CASUALTY CO. et al.
No. 3677.
Court of Appeal of Louisiana, Fourth Circuit.
April 6, 1970.
Rehearing Denied June 1, 1970.
*633 Drury, Lozes, Young & Curry, Felicien P. Lozes, New Orleans, for Veron Provisions Company, Inc. and American Employers' Insurance Co., appellants.
Porteous, Toledano, Hainkel & Johnson, William A. Porteous, III, New Orleans, for Peerless Insurance Co., appellee.
Before HALL, REDMANN, and BARNETTE, JJ.
REDMANN, Judge.
The principal question in this appeal is whether a third person damaged by an insured tort-feasor may bring a direct action for his damages against the tort-feasor's insolvent liability insurer's reinsurer.
A second question is whether an insured, entitled to be but not defended by the insurer, may by direct action against the reinsurer collect the reinsured portion of the cost of defense.

Factual Background
The basic factual background is not in dispute, yet perhaps should be set forth as an aid to making the legal discussions more understandable.
The litigation was initiated by persons seeking damages for personal injuries suffered in an automobile collision. The initial plaintiffs were Mr. and Mrs. Eugene Fontenot, the latter a guest passenger in a car driven by Lee Holloway. Mr. and Mrs. Holloway, the latter also a passenger in the car her husband was driving, by appropriate proceedings became parties and may also be characterized simply as plaintiffs for our purposes.
The circumstances of the collision are not relevant to this appeal; it suffices to say that Willie J. Louque, the driver of the other automobile, was held to have proximately caused the accident by his negligence.
Both the Fontenots and the Holloways had demanded damages from: (1) Louque's automobile's insurance carrier, Marquette Casualty Company; (2) Louque's employer, Veron Provisions Company, Inc.; and (3) Louque himself.
Not long after suit was filed, Marquette was placed into rehabilitation (and later, liquidation), and all proceedings against it were therefore ordered stayed.
Both Louque and his employer were named insureds under the Marquette policy, and Marquette would presumably have conducted their defense. But with Marquette in rehabilitation, the insureds had to conduct their own defense. At this point the employer parted company with Louque, and asserted its entitlement to indemnity against Louque, for whose negligence it would be only vicariously responsible.
Then the plaintiffs joined as a defendant the employer's liability insurer, American Employers' Insurance Company.
Shortly thereafter plaintiffs Holloway (but not Fontenot) joined as a defendant Marquette's reinsurer, Peerless Insurance Company. And the employer and American made Peerless a third-party defendant on their claim for indemnity and also sought from Peerless the cost of defense owed by Marquette.
We find no pleading by the Fontenots judicially asserting any claim by them against Peerless. Nor do we find any such pleading by Louque.
Subsequently a joint stipulation of Louque, his employer, American, and Peerless established (as to those parties) that Louque and the employer were insured under the Marquette policy; that the *634 employer was insured by American; that Louque was in the course and scope of his employment when the accident injured plaintiffs; that Marquette neither defended nor made any payment against plaintiffs' claims; that Peerless' reinsurance contract was in effect at the time of the accident; that American paid the Fontenots $7,500 and the Holloways $30,000, agreed by all stipulators to be proper quantum for their claims, for which amounts plaintiffs (by separate agreement) assigned their claims against Peerless and Marquette to American and the employer and Louque (sic). The stipulation further provided that judgment against Louque for $37,500 in favor of American and the employer should be rendered if Louque's liability was established on the basis of depositions in the record. Peerless waived no rights by the stipulation except to dispute the correctness of quantum.
The trial court awarded judgment against Louque in favor of the employer and American for $37,500; but in favor of Peerless dismissing the claims of the employer, American and Louque against Peerless.
American and the employer appeal from the latter portion of the judgment, and seek judgment both for the reinsured amount of the original plaintiffs' claims and for the cost of defending the employer.

Reinsurance in General
Some general notions of reinsurance may likewise be helpful as a background to this case; see Appleman, Insurance Law and Practice, §§ 7681-7707; 44 Am.Jur.2d, Insurance, §§ 1857-1867; 46 C.J.S. Insurance §§ 1220-1242.
Reinsurance is a standard practice of insurers, small and large. The smaller insurer, with assets not greatly in excess of minimum requirements, cannot financially withstand individually large losses. Even a very large company may consider it imprudent to have too many eggs in one basket, as it were, by remaining alone as the bearer of very large risks. An insurer which might easily carry the individual risks of 1,000 lives insured for $1,000 each might be unable or unwilling to carry the risk of one life insured for $1,000,000; or might carry the fire etc. insurance on 100 $10,000 buildings but be unable or unwilling to carry one $1,000,000 building. It is wholly unlikely that the 1,000 persons would die at once, or the 100 buildings be destroyed at once. But the death of one person insured for $1,000,000, or the destruction of the one $1,000,000 building, could require payment of proceeds equal to the requirements for the 1,000 lives or the 100 buildings.
An insurer which is offered a risk it does not wish to carry alone may itself spread the risk by obtaining "reinsurance" from other insurers, on a suitable basis such as for a percentage share of the risk, or for the excess over the original insurer's retained portion.
Of course the original insurer which issues a policy remains liable to its insured for the full amount of the insured risks. But as between that insurer and the reinsurers the final loss on the maturity of the risk will fall upon the reinsurers to the extent their contracts stipulate.
The original insured is usually unaware of the existence of reinsurance, did not bargain for it, and in other jurisdictions is usually said to be a stranger without privity to the contract of reinsurance and with no legal interest in it.
Thus in other jurisdictions the original insured lacks the procedural authority to sue on an ordinary reinsurance contract. And, in the case of the insurer's insolvency, the proceeds of reinsurance which are paid to the insurer's liquidator or receiver are usually treated as general assets of the insurer and are distributed prorata to all the insurer's creditors, rather than to the insured (or injured third party) whose loss or damage has caused the reinsurance *635 proceeds to become due. One case which cites several others for each of these propositions is United States to Use of Colonial Brick Corp. v. Federal Surety Co., 72 F.2d 964 (4 Cir. 1934), cert. denied, 294 U.S. 711, 55 S.Ct. 507, 508, 79 L.Ed. 1245.
The standard categorization of reinsurance is that it is a contract of indemnity against the insurer's loss. Often a reinsurance agreement is couched in terms of indemnity against loss, rather than against liability, by making actual payment by the insurer a condition precedent to entitlement to recover from the reinsurer. Such language may have the result, when the insurer becomes insolvent and cannot discharge its liability by actual payment, of defeating a claim even by the insurer's receiver calculated on the insurer's liability rather than its loss (incurred in discharging the liability), as in Fidelity & Deposit Co. of Md. v. Pink, 302 U.S. 224, 58 S.Ct. 162, 82 L.Ed. 213 (1937). The net result may be the reinsurer does not pay.
However, it may be questioned whether the condition precedent of prior payment may have force where a statute requires an insurer to have reserves but allows credit against reserves for losses which are reinsured. If statutory reserves are designed to assure policyholders that reasonably adequate funds will be maintained to cover losses, reinsurance as a substitute for reserves ought also to be available somehow for these purposes. Louisiana's statute expressly prevents such a stipulation against the reinsurer's liability in full on the insurer's insolvency, but only if the insurer is to use the reinsurance for credit as an asset or as a deduction from liability; LSA-R.S. 22:941, subd. B(2).

Peerless' Reinsurance
The reinsurance before us is embodied in a comprehensive treaty reinsuring a variety of Marquette's risks.
Third-party liability and automobile reinsurance is described as excess reinsurance, with Marquette retaining for its own exclusive account the first $10,000 of losses resulting from any one accident.
The contract reinsures up to $300,000 limits from any accident, and there is no gross total limit on Peerless' responsibility from all accidents combined. Peerless reinsures all of Marquette's risks exceeding $10,000 per accident.
The agreement does stipulate actual payment by Marquette as a condition precedent to recovery from Peerless, but an endorsement eliminates this requirement in case of Marquette's insolvency, providing that then "reinsurance hereunder shall be payable by the reinsurer on the basis of the liability of the Company [Marquette] under the contract or contracts reinsured without diminution on account of the insolvency of the Company." The endorsement does not expressly state to whom the reinsurance on the basis of liability under Marquette's reinsured contracts should be paid.
There is in the body of the basic reinsurance agreement a provision for monthly reports by Marquette to Peerless, to provide details of premium transactions and of losses and loss expenses, and an accounting to determine the balance owed by one party to the other. Peerless was of course entitled to a portion of all Marquette's premiums, with different divisions of premium for different kinds of insurance, and was also entitled to salvage; and Marquette was entitled to the reinsured portions of its losses and proportionate loss expenses from Peerless.
Thus, although there is no doubt Peerless was to be indebted to Marquette for the full reinsured amount of the loss and loss expenses, as a matter of bookkeeping and actual remittances Peerless was not obliged to pay that debt fully in cash but instead paid it in whole or part by credit in Marquette's favor against premiums and *636 salvage (if any) due from Marquette to Peerless.
Additionally, in respect to third-party liability insurance reinsurance, the premium payable by Marquette consisted of two elements, and one of those was provisional only and subject to limited adjustment up or down on the basis of loss experience. The first element may be roughly described as 60% of that part of Marquette's premium charge attributable by cited standards to Marquette's policy coverage exceeding $10,000/$10,000/$10,000 limits. The second element was 2½% of Marquette's net premiums, defined as gross (less cancellations) less the portion paid to Peerless as the first element of the reinsurance premium. This second element was to be adjusted at the end of each year (or six months if Peerless so elected), to make its total from inception of the reinsurance equal to 100/70 of Peerless' "total losses incurred (i. e., payments plus outstanding reserves for losses and loss expenses)", but not including the excess over $15,000 of loss from any one accident or the proportionate loss expense thereof; and in no case could the adjusted premium amount to more than 166% nor less than 66% of the total provisional element of 2½% of net as defined. If the total provisional premium paid by Marquette were more than the adjusted figure, Peerless had to pay Marquette the difference; if it were less, Marquette had to pay Peerless.
(For completeness, we also note one final calculation involving Peerless' loss and loss expense experience (and estimates), namely that of a contingent commission due from Peerless to Marquette annually, calculated as a percentage of Peerless' net profit since inception of this particular reinsurance.)
It thus appears that the recalculation of part of the premium for the third party liability insurance reinsurance occurred, even when Marquette was solvent, not at the time of a loss payable by Peerless, but only at the end of the contract year. Even then, whether or not an addition to or a rebate of premium became due depended not on a single accident nor even on one year's experience but on the cumulated experience (and estimates), excluding all excesses over $15,000 of loss from any single accident.
Accordingly, the circumstance that the premium adjustment might have to be made would not have been a valid defense to Marquette's claim against Peerless for a reinsured loss. So we reject Peerless' defense against the third party here that a premium adjustment might result in Peerless' favor, even if conceivably in excess of the third-party claim here. There is, in any case, no proof that the premium adjustment would result in Marquette owing Peerless more than the total of Peerless' liability under the reinsurance contract.

Third Person's Right of Action
In substance the question as to the third person is whether he can recover directly from the reinsurer the full amount his damage obliges the reinsurer to pay, or only such portion of that amount as might be allocated to him in the liquidation proceedings, if recovery can be had only by the insurer's liquidator and the liquidator treats the payment as a general asset of the insurer available to all creditors.
In other jurisdictions, with the probable exception of New Hampshire, see Hunt v. New Hampshire Fire Underwriters' Assn., 68 N.H. 305, 38 A. 145, 38 L.R.A. 514 (1895), one not a party to the reinsurance contract is denied an action against the reinsurer because of lack of privity of contract.
But this concept does not answer the question whether an injured third person has a right of action in Louisiana. A stranger injured by an insured is not privy to the insured's liability insurance contract, yet has immediately a right of direct *637 action against the liability insurer because of a statute, LSA-R.S. 22:655, reproduced in full in a footnote.[1]
If the reinsurance contract here is a "policy or contract of liability insurance" the reinsurer is itself a liability insurer subject to direct action; and its contract was "executed for the benefit of all injured persons * * * to whom the insured [the original insurer] is liable; and * * * it is the purpose * * * to give protection * * * for any legal liability said insured may have * * * for a tort-feasor * * *." R.S. 22:655.
Reinsurance is, in Louisiana, insurance, defined by R.S. 22:5(1) as "a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies." Reinsurer's argument that reinsurance is not insurance, but is like an investment or deposit, cannot coexist with that definition. A reinsurance agreement, compact, treaty, or whatever, is a policy in Louisiana, since (except for ocean marine and foreign trade insurance) R.S. 22:624, subd. A provides "The written instrument, in which a contract of insurance is set forth, is the policy." Liability insurance is defined by R.S. 22:6(4) as "Insurance against the liability of the insured for the death, injury or disability of an employee or other person, and insurance against the liability of the insured for damage to or destruction of another person's property."
It might with some force be argued that the reinsurer here does not insure against liability of the insurer for injury to third persons caused by an insured while the insurer is solvent, but only against the losses of the insurer on account of such liability. The reinsurance contract recites "the Reinsurer shall indemnify and reimburse the Company for all losses paid in cash by the Company * * *." However, as we have noted, when the insurer is insolvent, and thus unable to discharge its liability, the *638 reinsurance contract provides "reinsurance hereunder shall be payable by the Reinsurer on the basis of the liability of the Company [Marquette] under the contract or contracts reinsured without diminution on account of the insolvency of the Company."
Thus, while Marquette is solvent (it may be argued) Peerless owes nothing as long as Marquette is merely liable on a claim, and up until Marquette actually pays the claim, at which point of course Marquette is no longer liable, but has experienced a loss. It may be argued the insurance is not against liability, but against loss resulting from liability. While it may be questioned whether loss from liability has the same legal character as loss from, e. g., accidental fire, we may assume, without deciding, that this might not be liability insurance within the meaning of the direct action statute.
However, when the insolvency clause becomes operative, the reinsurer cannot benefit from insolvency or bankruptcy, which might discharge the liability of the insurer, and pay only on the loss "paid in cash". The reinsurer agrees it will pay "on the basis of the liability" of the insurer under its reinsured contracts.
At least upon insolvency, it appears to us, the contract is one of liability insurance, to protect the insurer against liability. There is no tertium quid: if only loss is insured against, a stipulation for payment beyond loss would amount to a gambling contract (for lack of insurable interest), and so the payment must be owed not against loss but against liability. The theoretical third alternative would be payment to one without interest because of another's loss. As pointed out in Hunt v. New Hampshire F. Underwriters' Assn., supra, the happiest thing that could happen to a reinsured insolvent casualty insurer is that all its reinsured risks should have suffered calamity, if the reinsurance proceeds benefit the insurer itself even though it does not pay the losses.
But even if we hold the reinsurance here is liability insurance, R.S. 22:941, subd. B (2) states as an exception to the general allowance of credit for reserves on ceded risks,
"No credit shall be allowed to any ceding insurer for reinsurance, as an asset or as a deduction from liability, unless the reinsurance shall be payable, in the event of insolvency of the ceding insurer, to its liquidator or receiver on the basis of the claim or claims allowed against the insolvent ceding insurer * * *." (Emphasis supplied.)
The difference, if any, between "credit for the reserves on such ceded risks to the extent reinsured" and "credit * * * as an asset or as a deduction from liability * * *" is not pointed out. Presumably an agreement of reinsurance can provide for payment to the liquidator, in which case the reinsured insurer's insured might have no claim for payment to himself under the agreement; see People ex rel. Hershey v. Cosmopolitan Ins. Co., 89 Ill.App.2d 225, 233 N.E.2d 90 (1967), not involving a direct action statute.
But the agreement here in fact does not provide for payment to the liquidator or receiver. And the general rule of construction resolving ambiguous language against an insurer has been applied against a reinsurer, Employers Mut. Liability Ins. Co. of Wis. v. Underwriters at Lloyd's, 177 F.2d 249 (7 Cir. 1949); see also LSA-C.C. arts. 1957 and 1958.
Under our statute it may be that the insurer was not entitled to credit for this reinsurance "as an asset or as a deduction from liability" (although the logical justification for the latter credit is not that reinsurance will be payable to the liquidator, but that it will be payable in full). But we cannot construe the agreement as stipulating for payment to the liquidator when it does not so stipulate. Perhaps the liquidator might nevertheless enforce the reinsurer's obligation, but the wording of *639 the reinsurance agreement does not suggest any contractual stipulation preventing its enforcement in a direct action by a damaged third party.
We conclude the reinsurance agreement, at least upon the insurer's insolvency, is a policy of liability insurance and the reinsurer is amenable to a direct action by a third party for an injury by the original insured for which the reinsured insurer is liable.
Reinsurer cites In re Security General Ins. Co., 140 N.W.2d 676 (S.D.1966), as authority that insolvency of the insurer effects no change in the reinsurer's relationships. This may be so under South Dakota's statutes. But the contract before us does make a special provision for insolvency, and in Louisiana R.S. 22:655 affords a direct action to a third person on contracts of liability insurance.
Reinsurer argues it seeks no escape from liability: "If the Commissioner [liquidator] seeks to collect any reinsurance, he must also face a tremendous recalculation of premium * * * and the liquidator will be a net debtor unto Peerless." This argument is factually unsupported by the record, and is of doubtful validity anyway. The recalculation only affects one element of the premium, and cannot increase the reinsurer's premium by more than 1.66% of insurer's net premiums as defined. It might even decrease the reinsurance premium. Ordinarily insurers survive and prosper because they make a profit from their premiums even if they must pay matured risks. That the reinsurer pays on this one risk does not mean it loses out overall on all assumed risks. And if it does, the injured third parties here are not obliged to guarantee it a profit (and even its reinsured never was).
Nor does reinsurer's conclusion follow that an award here would "tremendously increase a debt of Marquette Casualty Company in contravention of an injunction" in the liquidation proceedings. Marquette, the insurer, owes what it owes. If Peerless, the reinsurer, is due more premium, it is due it because of liabilities existing, even if not fixed, prior to the liquidation proceedings.
Nor are the reinsurance proceeds, available directly to third persons injured by the reinsured's insured, an asset of the reinsured. If the direct action statute affords recovery to the third person, the recovery does not belong to the insurer, but does benefit it by pro tanto discharging the insurer's liability.
Reinsurer refers to the 1875 Louisiana case of Egan v. Fireman's Ins. Co., 27 La. Ann. 368. There the Supreme Court held that the unwritten contract was no more than ordinary reinsurance not intended for another's benefit, and that an unwritten contract could not evidence a promise to pay the debt of a third person. Apart from factual differences, we have also a century of legislation since that case, including two complete revisions of our insurance law and the enactment of our direct action statute, R.S. 22:655, declaring liability insurance to intend to benefit injured third persons and providing them with a direct action against the insurer. The Egan case is nevertheless interesting for its apparent willingness to treat reinsurance as suretyship.
Many things might be said in favor of one policy determination rather than another. Reinsurance proceeds which are due directly and exclusively because of the pain and suffering and medical expenses and other damages of a hurt, maimed or disabled tort victim or his survivors would not appear to be a general bounty, of which all creditors might equally partake. On the other hand, if the reinsurance had not been contracted for, the premiums for it would have been a general asset still with the insurer and available to all creditors. Yet no one can fault the insurer for having paid for the reinsurance or seek to rescind it and reclaim its cost any more than in the case of any other contract; etc., etc. We believe our legislature has, by our direct action *640 statute, provided a policy choice requiring here that those whose over-$10,000 loss produces reinsurance proceeds ought, in view of the direct action statute, to be able to recover those proceeds; and other insureds or third-party creditors are not treated unfairly since no such proceeds are available except for the occurrence of the reinsured losses in which they have no insurable interest.
The whole concept of reinsurance as described in our R.S. 22:941 is a ceding by the insurer of "all or any part of its risks in this state" to the reinsurer, statutorily described as the "assuming insurer." If an insurer has a tort-feasor's possible tort as one of its risks, and cedes that risk to a reinsurer who assumes it, the legislative policy affording a direct action to an injured person against the liability insurer who has accepted the risk initially would seem equally applicable against the reinsurer who has assumed the risk.
Indeed, from the reinsurer's right to reject individual risks, it may be arguable that the reinsurer is the true underwriter, since the insurer itself would presumably refuse to insure a risk which it could not reinsure for the excess beyond its self-determined capacity to carry. If Marquette cannot afford to retain liability beyond $10,000, yet can't reinsure the excess because Peerless rejects the risk, Marquette has got to refuse the risk: Marquette can't become "the insurer" because "the reinsurer" rejects the risk! Query, who is the real insurer?
Perhaps we should also note the inherent inappropriateness of an injured person having full control over a claim the proceeds from which (according to reinsurer) belong to the insolvent insurer. If the liquidation dividend is small, say 50%, the injured stranger may prefer to withdraw his claim in order to obtain a larger settlement from the reinsurer, say 60 or 75%. Yet under the reinsurance contract the reinsurer should pay (to somebody) 100% of the reinsured claim. If the reinsurer owes the insurer 100%, why should the reinsurer be able to compromise the claim by paying 75% to a stranger? Why should the stranger be able to reduce the reinsurer's liability to the insurer to naught? The only way that this could make sense is by treating the insurer as merely a conduit, which at least other jurisdictions do not do upon liquidation, and which appears to be unprovided for by the Uniform Insurers Liquidation Law, LSA-R.S. 22:757-763. That law does not even mention reinsurance proceeds.
In spite of all reinsurer's arguments, we are persuaded still that, upon the insurer's insolvency, the reinsurer here is a liability insurer liable to a direct action by third persons for whose injuries the reinsured insurer is liable.
Damages to the injured third persons were stipulated to total $37,500, and the amount for which appellants seek to hold the reinsurer liable is the excess over $10,000 in any one accident, or $27,500.
But there are two apparent obstacles to judgment for $27,500.
First, in times of Marquette's solvency Peerless was not obliged to pay $27,500 in cash, but only that amount by which its total loss payment obligations exceeded its entitlement to its portions of Marquette's premiums and salvage, in accordance with the monthly accounting. However, Peerless introduced no evidence to show any premiums received by the insolvent Marquette or any salvage recovered for which Peerless should have credit (nor did it show the total of its own liabilities under the reinsurance treaty). We believe any such credit would be a defense on which Peerless has the burden of proof, and accordingly, for lack of evidence, this defense does not defeat appellants' claim.
Second, the Fontenots' assignment of their $7,500 claim to appellants may have entitled appellants to sue Peerless, but the Fontenots had not sued Peerless and appellants did not do so in their capacity as assignees of the Fontenots. Appellants *641 sued Peerless only for indemnification, and appellants were not cast in judgment; and we therefore have considerable doubt whether the claim for indemnification is still maintainable.
Nevertheless it is established, in this one lawsuit, that the total liability of Marquette from this one accident is $37,500, and the entire amount is due to parties whose interests are not in conflict. Although the claim on which judicial demand against Peerless has been made amounts to only $30,000, and it might be thought judgment should be limited to $20,000, appellants' evidence show they have an equally valid $7,500 claim which we think can properly be allowed as a credit for calculation purposes only to show that the liability of Marquette to appellants exceeds its $10,000 unreinsured liability by a total of $27,500.
We will therefore render judgment for the full $27,500 due under the reinsurance agreement.

Insured's Claim
The original insured is not a party to the reinsurance contract and cannot sue on that contract unless he is a third party beneficiary for whose benefit it stipulates some advantage, LSA-C.C. art. 1890 (or unless some provision of law gives him the right to sue, like the direct action statute does for tort victims only).
While the reinsurance contract does provide for an apportionment of cost of defense (excluding attorney's retainer) under which Peerless would have been liable to Marquette for 27,500/37,500 of Marquette's cost of defense, that liability is expressly made payable to Marquette, upon the monthly accounting.
Thus very plainly Peerlees does not expressly contract to pay part of cost of defense to Marquette's insureds. Nor can we say that the provision is nevertheless intended for their benefit, to enable Marquette to provide them a defense, since the only time Peerless can become liable ordinarily is after Marquette has already rendered a defense, and after liability has been determined and apportionment of cost of defense can be made.
Although there may be reasons why the insured ought to be able to recover in full any reinsurance proceeds attributable to his having had to pay his own defense, we simply cannot find any theory under which the insured is entitled to recover from the reinsurer directly on the reinsurance agreement.

Decree
Accordingly the judgment dismissing the suit against the reinsurer is affirmed insofar as it rejects the claim for the insured's cost of defense, and reversed insofar as it rejects appellants' claim as assignees of the injured third parties, and judgment is rendered in favor of American Employers' Insurance Company and Veron Provisions Company, Inc., and against Peerless Insurance Company in the amount of $27,500 together with legal interest from the date of judicial demand, and with costs of this appeal only, the parties to this appeal otherwise to bear their own costs.
Affirmed in part; reversed and rendered in part.
NOTES
[1] LSA-R.S. 22:655:

No policy or contract of liability insurance shall be issued or delivered in this state, unless it contains provisions to the effect that the insolvency or bankruptcy of the insured shall not release the insurer from the payment of damages for injuries sustained or loss occasioned during the existence of the policy, and any judgment which may be rendered against the insured for which the insurer is liable which shall have become executory, shall be deemed prima facie evidence of the insolvency of the insured, and an action may thereafter be maintained within the terms and limits of the policy by the injured person, or his or her survivors mentioned in Revised Civil Code Article 2315, or heirs against the insurer. The injured person or his or her survivors or heirs hereinabove referred to, at their option, shall have a right of direct action against the insurer within the terms and limits of the policy; and such action may be brought against the insurer alone, or against both the insured and insurer jointly and in solido, in the parish in which the accident or injury occurred or in the parish in which an action could be brought against either the insured or the insurer under the general rules of venue prescribed by Art. 42, Code of Civil Procedure. This right of direct action shall exist whether the policy of insurance sued upon was written or delivered in the State of Louisiana or not and whether or not such policy contains a provision forbidding such direct action, provided the accident or injury occurred within the State of Louisiana. Nothing contained in this Section shall be construed to affect the provisions of the policy or contract if the same are not in violation of the laws of this State. It is the intent of this Section that any action brought hereunder shall be subject to all of the lawful conditions of the policy or contract and the defenses which could be urged by the insurer to a direct action brought by the insured, provided the terms and conditions of such policy or contract are not in violation of the laws of this State.
It is also the intent of this Section that all liability policies within their terms and limits are executed for the benefit of all injured persons, his or her survivors or heirs, to whom the insured is liable; and that it is the purpose of all liability policies to give protection and coverage to all insureds, whether they are named insureds or additional insureds under the omnibus clause, for any legal liability said insured may have as or for a tort-feasor within the terms and limits of said policy.